**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROSEWOOD CANCER CARE, INC., ) | |
| and JEFFERSON RADIATION ) | |
| ONCOLOGY CENTER, L.P., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 14-434 |
| ) | |
| THE TRAVELERS INDEMNITY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## OPINION

**CONTI, Chief District Judge**

### I.  Introduction

This civil action arises from an insurance dispute between plaintiffs Rosewood Cancer Care, Inc. ("Rosewood") and Jefferson Radiation Oncology Center, L.P. ("Jefferson" and together with Rosewood, "plaintiffs"), and the Travelers Indemnity Company ("Travelers" or "defendant").  The dispute concerns an incident in which water from a leaking pipe allegedly caused damage to a linear accelerator that was utilized in plaintiffs' facility to provide radiation treatment to cancer patients.  Plaintiffs contend that the damaged linear accelerator was subject to their insurance policy's higher limits applicable to "building" coverage, while defendant maintains that it was subject to the lower limits that applied to "business personal property." Plaintiffs further claim that defendant's conduct in the adjustment of their claim amounted to bad faith.  The court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1332.

Presently pending before the court are plaintiffs' motion for partial summary judgment (ECF No. 113) and defendant's cross-motion for summary judgment on all counts (ECF No.

118).  Also pending is a motion by plaintiffs to strike the affidavit of Chaz Beadling, which

defendant submitted in support of its summary judgment motion (ECF No. 127).  For the reasons

that follow, plaintiffs' motion for partial summary judgment will be granted, defendant's motion

for summary judgment will be granted in part and denied in part, and plaintiffs' motion to strike

will be denied.

## II.    Background Facts and Procedural History[1]

The Parties and the Facility at 521 East Bruceton Road

Jefferson operates a radiation oncology center that provides free-standing radiation

therapy to cancer patients.  (ECF No. 147, ¶ 37.)  Since its inception in 1991, Jefferson has

operated its business out of a facility located at 521 East Bruceton Road in the City of Pittsburgh,

Pennsylvania.  (*Id*. ¶¶ 36, 38.)

Jefferson was originally owned by Oncology Services Corporation ("OSC") in

partnership with Jefferson Hospital.  (D. Colkitt Dep. at 14:3-24, ECF No. 121-22.)  In 1991,

OSC acquired the property situated at 521 East Bruceton Road with the specific intent to build a

facility there that would function as a radiation oncology treatment center.  *Id*. at 12:4-13-4.)

After it was built, OSC leased the facility to Jefferson, which then operated its treatment center at

the facility.  (*Id*. at 13:13-21.)  In or around 2001, OSC sold the building at 521 East Bruceton

Road to Mercury III, LP, the current owner.  (*Id*. at 11:14-19.)

Rosewood was formed in 1999 by Donald Gallo ("Gallo") and Paul M. Castro, Ph.D.

("Castro") to provide management and physician services to cancer and oncology centers,

---

[1] The following background facts are derived from the parties' Amended Combined Concise Statement of
Undisputed Material Facts Regarding Plaintiffs['] Motion for Partial Summary Judgment (ECF No. 146), the
[Defendant's Amended] Combined Concise Statement of Material Facts in Support of Defendant's Motion for
Summary Judgment (ECF No. 147), and portions of the evidentiary record that are otherwise unrebutted.

particularly Jefferson.  (ECF No. 147, ¶¶ 45-47.)  To that end, Rosewood acquired an ownership interest in Jefferson and became its general partner in 1999.  (*Id*. ¶¶ 41, 48.)[2]  Rosewood's acquisition of Jefferson did not involve a purchase of the building at 521 East Bruceton Road. (*Id*. ¶ 42.)

The Varian 2100c Linear Accelerator

At issue in this case is a device known as the Varian 2100c Linear Accelerator (referred to herein alternatively as the "Linac" or the "Varian Linac").  A linear accelerator is designed to generate radiation that is used to treat cancer patients.  (ECF No. 114-10, ¶4.)  When the facility at 521 East Bruceton Road was constructed in 1991, it was specially designed to be a radiation therapy center and to house a linac.  (*Id*. ¶ 5.)  The original model used at Jefferson's treatment facility was a Mitsubishi.  (*Id.*; *see* ECF No. 147, ¶43.)

In 2008, the Mitsubishi Linac suffered a catastrophic failure and was replaced with the Varian 2100c Linac that is the subject of this litigation.  (ECF No. 114-10, ¶ 8; ECF No. 147, ¶¶51-52.)  Castro, a medical physicist, personally oversaw the removal of the Mitsubishi Linac and the installation of the Varian Linac, which is still currently housed at Jefferson's treatment facility in a special room known as a "vault."  (ECF No. 121-10, ¶¶ 14 and 20; ECF No. 114-10, ¶¶ 6, 8.)  The vault is specifically designed and constructed to shield radiation emitted by the Linac.  (ECF No. 114-10, ¶6.)  To that end, it contains primary shielding of approximately 5 to 6 feet of high density concrete and secondary shielding of approximately 2 to 3 feet of high-density concrete.  (*Id*.)  In addition, the door to the vault room is lined with lead in order to shield those outside the room from the radiation produced by the Linac.  (*Id.* ¶14.)

---

[2] It appears that Gallo and Castro are Jefferson's limited partners and that no other individuals or entities have an ownership interest in Jefferson. (*See* M. Colkitt Dep. at 12:16-24, ECF No. 121-23.)

Removal of the Mitsubishi Linac took about one week and involved a team of workers and the use of extensive equipment. (ECF No. 114-10, ¶9; ECF No. 147, ¶54.) Welding torches were used to cut the Mitsubishi Linac into many pieces so that it could be removed from the building. (ECF No. 147, ¶55.) In addition, workers used jackhammers to dislodge concrete and access the Linac's steel base frame, which had been cemented two feet below the floor's surface. (ECF No. 114-10, ¶9; ECF No. 147, ¶56.)

Installation of the Varian Linac took approximately two months and required a team of specialized workers. (ECF No. 114-10, ¶ 10; ECF No. 147, ¶64.) The Linac's steel base frame was cemented into the vault room floor using at least one foot of high-density, specially cured concrete. (ECF No. 114-10, ¶¶10, 13; ECF No. 147, ¶65.) The treatment couch, where the patient lies, and the gantry stand, which is located on the other side of the treatment room, weigh thousands of pounds; consequently, riggers and specialized equipment were used to put the treatment couch and gantry in place. (ECF No. 114-10, ¶10; ECF No. 147, ¶66.) The gantry and treatment couch are attached to the steel base frame in six places by bolts which pass through one foot or more of concrete into the base frame below the flooring. (ECF No. 114-10, ¶¶ 10, 13; ECF No. 147, ¶68.) A special high-voltage electrical line is hardwired into the Linac and runs from the machine, through the building, to the outside electric utility line. (ECF No. 114-10, ¶11; ECF No. 121-10, ¶17, ECF No. 147, ¶69.) This electrical line had to be specially approved by the electrical utility. (*Id.*) The Linac also utilizes two water lines that are connected to the building's internal water lines. (ECF No. 147, ¶70.) One plumbed line connects the Linac to the municipal water system, while a second plumbed line serves a closed loop cooling system. (ECF No. 114-10, ¶12.) In its present state, the Varian Linac remains plumbed, wired, and

cemented into the building and cannot be removed without damaging the facility's physical plant. (*Id.* ¶15.)

The Policy

At times relevant to this case, plaintiffs had in place a commercial insurance policy (hereafter, the "Policy") issued by Travelers.[3] (ECF No. 146, ¶¶ 1, 3.) The Policy has a limit of $559,620 for "building" coverage and a limit of $103,000 for "business personal property" coverage. (Id. at ¶¶ 4-5.)

In relevant part, the Policy provided as follows:

**A. COVERAGE**

We will pay for direct physical loss or damage for Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building**, meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Machinery and equipment permanently attached to the building or structure;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

---

[3] The current owner of the building, Mercury III, LP, is listed as an additional insured on the Policy at issue, although it is not a party to this lawsuit. (*See* D. Colkitt Dep. at 49:8-10, 50:14-18, ECF No. 121-22.)

**(c)** Floor coverings;

**(d)** Lobby and hallway furnishings owned by you;

**(e)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering (not used for restaurant operations);

**(f)** Lawn maintenance and snow removal equipment; and

**(g)** Alarm systems

**(5)** If not covered by other insurance:

**(a)** Alterations and repairs to the building or structure; and

**(b)** Materials, equipment, supplies, and temporary structures, on or within 1,000 feet of the described premises, used for making alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following...

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy or lease, but do not own; and

**(b)** You acquired or made at your expense but are not permitted to remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless coverage is otherwise provided for under Personal Property of Others.

\*\*\*

(Compl. Ex. A, ECF No. 114-1, at 20-21; bold in the original; ellipses added.)

<u>The Loss Incident and Adjustment of Plaintiffs' Claim</u>

In early January 2014, Jefferson's treatment facility sustained water damage after a water pipe burst. (ECF No. 147, ¶82.) Plaintiffs maintain that the water infiltration caused damage to the Varian Linac. (*Id.* ¶83.) On January 15, 2014, plaintiffs gave notice of its losses to Travelers. (*Id.* ¶84.) The claim was assigned to JeVarn O'Neal ("O'Neal") the following day. (*Id.* ¶85.) Claims adjuster Amanda Strittmatter ("Strittmatter") was assigned to handle the business personal property portion of the claim. (*Id.* ¶87.)

O'Neal contacted plaintiffs' attorney, Marcy Colkitt ("Colkitt"), on January 16, 2014 and scheduled an inspection of the property. (ECF No. 147, ¶86.)[4] The inspection was performed by Strittmatter on January 31, 2014. (ECF NO. 146, ¶10.) During the inspection, Castro informed Strittmatter that plaintiffs were working to schedule an engineer to evaluate the damage to the Linac, as there was evidence of water damage and the machine would not start. (ECF No. 114-11.) Strittmatter logged these events on February 3, 2014. (*Id.*)

On February 4, 2014, O'Neal issued a letter to plaintiffs sending a partial payment for damage to the building as well as an estimate of the building damage. (ECF No. 147, ¶89.) The letter did not address the Varian Linac. This prompted Colkitt to email O'Neal, stating "I want to clarify that Varian 2100C linear accelerator which was damaged in the water leakage is covered under "Building" limits of $559,620 as it is permanently attached to the building. If there is any disagreement with this position please advise me at this time...." (ECF No. 114-4.)

---

[4] According to Travelers, O'Neal subsequently sent Jefferson a reservation of rights letter on January 30, 2014, notifying plaintiffs of their duties under the Policy and advising that Travelers was in the process of investigating the loss and had not made a determination of coverage. (ECF No. 147, ¶88.) Plaintiffs dispute that this letter was sent. (Id.)

On February 9, 2014, Strittmatter sent an email to Colkitt stating that she was "reviewing the coverage of the linear accelerator machine either under building or business personal property" and asking that Colkitt give her "until the latest Feb 14, to get your questions and concerns resolved for you." (ECF No. 121-37.) Colkitt replied that same day:

> [T]he linear accelerator... is physically cemented into the building and the water and electrical lines are all integrated as well. I don't see any argument that it is not part of the building. The linear accelerator engineer has advised us that it will cost $100,000 in repairs to just attempt to get beam out of the machine. In all likelihood the linac is now completely ruined and will need to be removed soon.

(ECF No. 121-7.) The following day, Strittmatter and Colkitt spoke by phone "to further review the linear accelerator machine." (ECF No. 121-3 at 9.) According to Strittmatter's notes, "Marcy advised the machine would not be removed if they would sell the location, it would be include[d] in the sale to a new individual. Advised Insured I would further review with CR Jevan [sic] O'Neal." (*Id.*)

Strittmatter emailed Colkitt again on February 18, 2014, to notify Colkitt about the estimate that had been approved for business personal property cleaning and replacement and also to advise that a payment of undisputed items was being issued. (ECF No. 114-5.) Later that day, Colkitt emailed Strittmatter and reiterated plaintiffs' position that the Linac was subject to the policy limits on the building. (ECF No. 121-16.) Colkitt also advised Strittmatter that:

> [r]eplacement of the linear accelerator with a new unit will be in excess of $1 million dollars. It will cost over $100,000 to determine if the linear accelerator is even capable of being repaired.
>
> Before we go any further down that path we need to know Traveler's position in writing. As I have advised you and as you saw in person, the linear accelerator is built into the building, cemented into it, wired into [sic], water lines into it and in fact the room that houses it, known as a vault, is built specifically to hold it. The liner [sic] accelerator weights [sic] more than a ton and has to be rigged into place and cemented into place. I truly cannot imagine how under the policy definitions it would not be covered as part of the building limit. With that said, we need to get this addressed by Travelers now so we can proceed appropriately....

(*Id.*)  In response to this communication, Strittmatter emailed O'Neal and asked him to "please review and address with Marcy.  I have confirmed the linear accelerator machine is permanently installed in the structure, cemented and hardwired to the building.  Marcy advised the machine would not be taken with them if they would leave the building."  (*Id.*)  Strittmatter copied her email to Brian Murphy, a claims unit manager for Travelers.

Following this exchange, Murphy obtained input from Travelers' Property Technical Claim Unit ("PTCU") concerning the proper classification of the Linac.  (ECF No. 121-3, at 22.) Murphy initially emailed Joseph B. McFarland, an associate manager in the Catastrophic Claims Department, noting that the building limit might apply "since the equipment is built into the building."  (ECF No. 121-18.)  McFarland, in turn sought input from Steve Turowski, a PTCU technical claims manager.  (*Id.*)  McFarland emailed Turowski on February 19, 2014, stating "[a]s per our conversation, based on the facts as currently presented, it could be argued that this could potentially be a building item.  Steve, please review and let us know your thoughts or if you feel this would fall under BPP."  (*Id.*)

The following day, Turowski sent Murphy some links to websites that discuss linear accelerators along with notation, "At this point I am not convinced this would be a building item."  (ECF No. 121-35.)[5]  Murphy spoke with an engineer later that day and reported that the engineer "has had limited experience with linear accelerators but from his experience the linear accelerator was not considered part of the building."  (ECF No. 121-3, at 22.)

Meanwhile, Colkitt and O'Neal exchanged communications on February 20, 2014, regarding the progress of plaintiffs' claim.  O'Neal informed Colkitt there was "a coverage issue" with the Linac and the matter was still under investigation.  (ECF No. 121-3, at 23.)

---

[5] Turowski subsequently opined at his deposition that a linear accelerator is a piece of medical equipment that must be secured to the building due to its size and weight, but it is not a building item because it does not function to service the building; rather, it is an item that was serving the business to treat patients.  (ECF No. 147, ¶101.)

Based on their conversation, Colkitt understood that "it would be a couple of days until [plaintiffs] received Traveler's coverage position with respect to the linear accelerator as this matter has been kicked upstairs at Travelers for review." (ECF No. 114-7.) O'Neal assured Colkitt that he would send the letter with the coverage determination on the Linac as soon as he was able. (*Id*.) O'Neal's internal notes indicate that he spoke to Colkitt about some of the questions that management had advised him to pursue. (ECF No. 121-3, at 23.) Colkitt provided answers to most of O'Neal's questions but, per his notes, she was unsure who the service provider for the Linac was or when it was inspected and serviced, and she was "not going to jump through anymore hopes [sic] to provide [O'Neal] with this information" until Travelers provided a coverage determination in writing. (*Id*.)

On February 23, 2014, O'Neal sent Jefferson a "reservation of right" letter confirming, among other things, that the investigation into its claim was continuing and that no decision had yet been made either confirming or denying coverage. (ECF No. 121-20.) The letter also advised plaintiffs about their duties following loss, which included preparing a detailed inventory of damaged property, showing the damaged property when asked, and possibly submitting to an examination under oath. (Id.)

On February 24, 2014, Travelers concluded that the Varian Linac was business personal property and not part of the building. (ECF No. 147, ¶106.) O'Neal spoke with Colkitt by phone the following day and advised her that Travelers would be covering the Varian Linac as business personal property. (*Id*. ¶108.) Colkitt stated that she disagreed with the coverage position and intended to sue Travelers. She asked that O'Neal place Travelers' decision in writing. (*Id*. ¶109.) O'Neal informed Colkitt that Travelers wanted to continue its coverage investigation and would need the Linac's serial number, as it had "reached out to the

manufacturer who will inspect the machine for us to determine cause of damage, and reparability of the accelerator as well." (ECF No. 121-3, at 28.) O'Neal explained that he and Strittmatter would need to enter Jefferson's facility to complete its business personal property inventory in order to process a payment under the policy for the damaged business personal property. (*Id.*)

By letter dated February 28, 2014, Colkitt confirmed her understanding that Travelers was treating the Varian Linac as "contents of the policy" rather than as part of the building. (ECF No. 114-19.) Colkitt expressed her clients' disagreement, based on the fact that the Linac "is completely built, wired and cemented into the building structure." (*Id.*) Colkitt wrote, "You stated that since the Linear Accelerator had once been replaced after being in the building in excess of 16 years, that it was now considered to be contents. So that the record is clear, the Linear Accelerator that was replaced became non-functional and was scrapped." (*Id.*) Colkitt reiterated that she "look[ed] forward to receiving the written position of Travelers on this issue as promised." (*Id.*)

Plaintiffs were subsequently contacted by Daniel M. Reed, a property technical specialist for Travelers, via correspondence dated March 4, 2014. Mr. Reed's letter advised that plaintiffs' claim remained open pending Travelers' continued investigation into the following aspects of the loss: (1) the occupancy and use-interest of the building prior to loss; (2) current ownership interests in the building; (3) an inventory of all business property in the building, which was needed to determine compliance with the Policy's coinsurance provision; and (4) confirmation of when the building last provided patient care. (ECF No. 121-21.) The letter stated that "[t]hese along with other aspects of the loss requiring further investigation will be addressed in more detail through an examination under oath to be performed by Travelers['] outside legal

counsel...." (*Id.*)  The letter reminded Jefferson that submitting to an examination under oath is a requirement of the Policy as set forth in the Policy's loss conditions.  (*Id.*)

Colkitt telephoned Reed on March 6, 2014 after receiving Reed's correspondence.  (ECF No. 121-3 at 34.)  In the course of their conversation, Reed explained to Colkitt that additional investigation was needed about whether the insureds were meeting the requirements of the Policy's coinsurance provision relative to the BPP loss.  Reed explained that Travelers needed to investigate "occupancy /vacancy matters and other matters concerning when the business was last in operation."  (*Id.*)  Reed reiterated that the Linac was being considered a BPP item at that time, and Colkitt conveyed plaintiffs' adamant disagreement with that position. (*Id.*)

During this time frame, Colkitt continued to contact O'Neal regarding Travelers' position about the Linac.  On March 4, 2014, she emailed O'Neal:

> We have just received a generic claims loss letter in the mail from you.  You advised me that we would be receiving a letter from Travelers taking the position that the linear accelerator was considered "CONTENTS" under the applicable policy and was NOT covered under the BUILDING limits.  We still have not received any such letter or formal position.  Where is the letter?  Is there someone else at Travelers I need to be speaking with?"

(ECF No. 114-8.)  This email was followed with another one on March 12, 2014, in which Colkitt wrote:  "Another week has passed and I still have not received the promised letter from Travelers [sic] on the linear accelerator.  Where is this letter ???????"   (ECF No. 114-9.)

On March 17, 2014, Strittmatter sent Jefferson a reservation of rights letter in which she represented that Travelers had been "unable to determine whether your claim is covered under the policy based on the information available to us at this time," and reserving its "right to deny all or a part of your claim that is not covered." (ECF No. 1-15.)  The letter directed Jefferson to the loss conditions in the Policy, which included, among other things, Jefferson's duty to provide complete inventories of all damaged and undamaged property, permit inspection of the damaged

property, submit a sworn proof of loss, and submit to an examination under oath. Strittmatter's letter requested that Jefferson "comply with all conditions of [its] policy." (*Id.*) It represented that Travelers would "continue to research [plaintiffs'] claim under a full reservation of rights until coverage is determined." (*Id.*)

Strittmatter's letter was followed by a letter from Colkitt to Reed on March 21, 2014, in which Colkitt accused Travelers of acting in bad faith:

> It has been over 6 weeks since Travelers orally advised the insured that the linear accelerator that suffered water damage was being considered "contents" under the policy. As you are aware, the insured take the position that the linear accelerator is considered as part of the building coverage.
>
> Despite our repeated requests, to date Travelers has <u>refused</u> to put its position or logic into writing.
>
> Now the insureds have been suddenly advised by Property Specialist Amanda Strittmatter that Travelers is <u>refusing</u> to process and pay any more content claims.
>
> Is Travelers also now <u>refusing</u> to pay the balance owed for the building water damage repairs that we have been having completed? If so, why?
>
> We believe the answer is quite simple. Travelers['] conduct suddenly changed when it believed it had significantly increased financial exposure due to the linear accelerator being covered under the building limit ... as opposed to the contents limit of $103,000. This is the definition of bad faith under Pennsylvania law.
>
> The insured are not interested in playing these insurance games and will proceed accordingly.

(ECF No. 1-14.)

Meanwhile, Travelers' outside counsel, Richard DiBella, Esq., sent letters to Colkitt on March 12, 2014, and March 25, 2014, to request certain documentation from plaintiffs and to establish a time and date for an examination under oath. (ECF No. 121-27 and 121-28.) Colkitt responded to Mr. DiBella by email on March 31, 2014, asking him to "[k]indly advise ... if you are authorized to accept service on behalf of Travelers. As for your request for documents and

an oral examination, that will need to be done in the confines of the litigation." (ECF No. 121-29.)

Colkitt followed this with correspondence dated April 1, 2014 in which she reiterated her clients' belief that Travelers is in violation of Pennsylvania law and "in direct conflict with the express language of the subject Policy." (ECF No. 121-30.)

On April 2, 2014, Reed sent another reservation of rights letter to Colkitt advising that Travelers would be proceeding with its inquiry into whether certain conditions in the Policy had been met. (ECF No. 121-31.) The letter stated, in relevant part:

> We understand from Mr. DiBella that you have responded to him in the last few days, indicating that you are filing suit in this matter. Because it is Travelers['] intention, with the insureds' full cooperation, to bring this claim to a resolution, we ask that you refrain from filing an action until the insureds have complied with all relevant policy terms and conditions, and until we have made a final determination. Your prompt response to Mr. DiBella's request for an examination under oath is essential to our resolving Jefferson Radiation's claim expeditiously.

> \*\*\*

> Since there are significant questions as to the occupancy of and ownership interest in the building and its equipment, as well as the nature of the linear accelerator, which you have called into question, Travelers will continue to review the facts and circumstances of the claim.

> \*\*\*

(ECF No. 121-31.)

<u>The Procedural History</u>

Plaintiffs commenced this litigation on April 3, 2014 with the filing of their three-count complaint. (ECF No. 1.) Count One of the complaint seeks a declaration by this court that the Varian Linac is covered as part of the "building" under the Policy and is therefore subject to the higher coverage limit of $559,620. Count Two asserts a claim for breach of contract based on Traveler's failure to provide coverage pursuant to the "building" limits and refusal to process

plaintiffs' claims for damage to its "contents." Count Three alleges that Travelers engaged in bad faith in the adjustment of plaintiffs' claim.

Following extensive pretrial proceedings, plaintiffs filed their pending motion for partial summary judgment (ECF No. 113). In their motion, plaintiffs seek a judicial determination that the Varian Linac is covered under the "Building" portion of the Policy based on the theory that the Linac is equipment that is "permanently attached" to the building as set forth in Policy §A.1.a.3. Plaintiffs posit that all remaining issues, including damages, can be determined at trial.

Defendant filed its cross-motion for summary judgment (ECF No. 118) on November 2, 2015. In its motion, Travelers seeks summary judgment on all three of plaintiffs' claims. Travelers posits that the Varian Linac is unambiguously covered as "Business Personal Property" under the Policy, and the undisputed evidence shows that it did not make any coverage decisions in bad faith.

The issues relevant to these motions are adequately briefed. Accordingly, the motions are ripe for disposition.

### III.    Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 322, 325; *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007).

Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a fact finder to decide. Fed. R. Civ. P. 56(e); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex*, 477 U.S. at 323–25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.    Discussion

### A.  The Parties' Competing Interpretations of the Policy

This case involves interpretation of an insurance policy, which is a question of law for the court.[6]  *See PNC Finan. Servs. Group, Inc. v. Houston Cas. Co.*, 647 F. App'x 112 (3d Cir. 2016) (noting that the determination of "the existence or nonexistence of coverage is generally performed by the court") (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa.2007)); *Scottsdale Ins. Co. v. City of Easton,* 379 F. App'x 139, 151 (3d Cir. 2010) (interpretation of the scope of coverage is a question of law for the court).  A court's "primary goal in interpreting a policy ... is to ascertain the parties' intentions as manifested by the policy's terms." *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 293 (3d Cir.2012) (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). Where "the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Id.* (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).  If a provision of a policy is ambiguous, however, courts generally construe the provision "in favor of the insured and against the insurer, the drafter of the agreement." *Gardner*, 544 F.3d at 558 (quoting *Standard Venetian Blind Co.*, 469 A.2d at 566).

A contractual provision is ambiguous where "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gardner*, 544 F.3d at 558 (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)).  Courts should not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *see also Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n. 3 (3d Cir.1998) (applying Pennsylvania law). "Disagreement between the parties over the proper interpretation of a contract does not

---

[6] The parties to this case agree that Pennsylvania law governs the interpretation of the subject policy.

necessarily mean that a contract is ambiguous." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir.2011) (applying Pennsylvania law) (quoting *12th St. Gym, Inc. v. Gen. Star Indem. Co.*, 93 F.3d 1158, 1160 (3d Cir. 1996)). If possible, courts must interpret an insurance policy to avoid ambiguity and give effect to all of its provisions. *Am. Auto Ins. Co. v. Murray,* 658 F.3d 311, 321 (3d Cir. 2011); *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 363 (3d Cir. 2004). Courts must also avoid interpreting an insurance policy in such a way as to render any term meaningless or superfluous. *Toffler Assocs., Inc. v. Hartford Fire Ins. Co.,* 651 F. Supp. 2d 332, 344 n.3 (E.D. Pa. 2009).

A contract is not necessarily rendered ambiguous by the fact that it does not define certain terms. *Simon Wrecking Co., Inc. v. AIU Ins. Co.,* 350 F. Supp. 2d 624, 636 (E.D. Pa. 2004). Rather, "[w]here critical terms are left undefined in a policy, Pennsylvania case law instructs that words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and we may inform our understanding of these terms by considering their dictionary definitions." *Canal Ins. Co. v. Underwriters at Lloyd's London,* 435 F.3d 431, 444 (3d Cir. 2006) (internal citations and quotation marks omitted); *see also Bruno v. Erie Ins. Co.,* 106 A.3d 48, 75 (Pa. 2014) ("As our Court has noted many times in the past, the common and approved meaning of a word may be ascertained from an examination of its dictionary definition.") (citations omitted). Courts may also consider whether an undefined term possesses a clear legal meaning that will render the term unambiguous. *See City of Erie, Pa. v. Guaranty Nat. Ins. Co.,* 109 F.3d 156, 163-64 (3d Cir. 1997) (relying on Pennsylvania law to determine when the tort of malicious prosecution "occurs" for purposes of occurrence-based insurance policy)(citing authority); *see also Whole Enchilada, Inc.,* 581 F. Supp. 2d at 699 (referring to Pennsylvania law to define the term "publicity"). "Whether ambiguity exists cannot be resolved

in a vacuum, ... but must instead be considered in reference to a specific set of facts." *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001) (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)); *accord Kropa v. Gateway Ford*, 974 A.2d 502, 508 (Pa. Super. Ct. 2009), *appeal denied*, 990 A.2d 730 (Pa. 2010).

In this case, plaintiffs take the position that the Linac falls under the Policy's provision for "building" coverage pursuant to Section A.1.a.3, because the Linac is "equipment" that is "permanently attached to the building." Travelers argues that, pursuant to Sections A.1.b.1 and 2, the Linac is properly considered a "fixture" or "machinery and equipment" that is "business personal property." Upon review of the entire Policy and consideration of the parties' arguments, and giving due consideration to the aforementioned rules of contract construction, the Court finds that the Policy is reasonably susceptible to both interpretations.

Under the Policy, "machinery and equipment" is covered as business personal property unless it is "permanently attached to the building or structure," in which case it is subject to coverage for the "building." Travelers concedes "[i]t is undisputed that the Varian Linear Accelerator constitutes 'machinery and equipment,' so the operative question becomes whether it was permanently installed in the building." (Def.'s Br. Supp. Mot. Summ. J. at 15, ECF No. 119.) The Policy does not define the critical phrase, "permanently attached to the building or structure." Nevertheless, the term "attached" is commonly defined as "joined or connected physically," or "[d]irectly adjoining; joined to a wall, etc., rather than standing clear; sharing a wall, not detached."[7] The term "permanent" is commonly understood to mean "[c]ontinuing or

---

[7] *See* "attached, adj." *OED Online*. June 2016. Oxford University Press. http://www.oed.com/view/Entry/12704?redirectedFrom=attached (accessed September 02, 2016).

designed to continue or last indefinitely without change; abiding, enduring, lasting; persistent. Opposed to *temporary*." [8]

Applying these commonly understood meanings, the Varian Linac can reasonably be considered "machinery" or "equipment" that is "permanently attached to the building or structure" in question. The Linac is clearly "attached" to the surrounding building because it is "joined" or "connected physically" to the building by means of the floor bolts, the concrete encasement of the base frame, and the electrical and water lines. Moreover, the physical complexity of the installation process and the manner in which the Linac is affixed to the building can reasonably be viewed as indicative of "enduring" attachment to the property that is "designed to continue or last indefinitely without change." As previously discussed, installation of the Linac was a two-month long process which involved a team of specialized workers and the use of specialized equipment. The base frame of the Linac is cemented below the floor of the building structure, and the gantry and patient couch are secured into place in six locations where bolts penetrate a foot or more of concrete and attach to the steel frame below. The "vault room" in which the Linac is housed was specially constructed with high density concrete shielding and a lead-lined door in order to prevent radiation leakage. Plumbers and electricians were needed in order to construct the Linac's water and electrical lines, and a medical physicist (Castro) was required in order to perform the requisite shielding study. Neither installation nor removal of the Linac could occur without physical damage to the facility's plant. Removal of the Linac would involve a team of workers and would require, among other things, jackhammering through the concrete floor in order to dislodge the base frame below. Based on these facts, the Varian Linac

---

[8] *See* "permanent, adj. and n.". *OED Online*. June 2016. Oxford University Press. http://www.oed.com/view/Entry/141184?rskey=zW6Vsj&result=1&isAdvanced=false (accessed September 02, 2016). (emphasis in original).

can reasonably be viewed as "permanently attached" to the building for purposes of Policy Section A.1.a.3.

The decision in *Allegrino v. Conway E&S, Inc.,* Civil Action No. 09-1507, 2010 WL 4052923 (W.D. Pa. Oct. 14, 2010), is potentially instructive in this case, and both plaintiffs and defendant cite if for support of their respective interpretations of the Policy.   In *Allegrino*, the court considered whether certain telecommunications and computer equipment was part of the insured's "building" for purposes of determining whether coverage existed under the insured's commercial insurance policy.   The policy language at issue was substantially similar to the language at issue here.   In relevant part, the coverage for the insured "building" included:

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

      (a) Machinery and

      (b) Equipment; [and]

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

      (a) Fire extinguishing equipment;

      (b) Outdoor furniture;

      (c) Floor coverings; [and]

      (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering; ...

2010 WL 4052923, at *8-9.

Relevantly, the court in *Allegrino* found that the equipment in question was not "permanently installed" for purposes of the policy's building coverage.   The court explained:

The terms "permanent" and "installed" are not defined in the policies. (See Docket Nos. 187–1; 187–2).   But, these are words of common usage that have general meanings.... The general definition of "permanent" is "continuing or enduring without fundamental or marked change." MERRIAM-WEBSTER'S

COLLEGIATE DICTIONARY (11th ed. 2003) at 923. Further, to "install" a thing is "to set [it] up for use or service." MERRIAM-WEBSTER'S, *supra* at 648. Thus, the general definition of "permanently installed equipment" would be equipment that was set up for use or service for a continuing or enduring period of time. This definition is akin to the legal definition of a "permanent fixture," which is "irremovable" property attached to realty. [BLACK'S LAW DICTIONARY, "fixture" (8th ed.2004).] Again, given Plaintiff's admissions that the telecommunications and computer equipment were only mounted on a wall and that he removed this property from the building and relocated it to New York, the property was not "permanently installed."...

2010 WL 4052923, at *9.

Although the court in *Allegrino* found that no insurance coverage was available under the policy's "building" provision, its reasoning arguably supports a finding of coverage in this case, which is factually distinguishable. Notably, the court's interpretation of the word "permanent" as meaning "continuing or enduring without fundamental or marked change" is very similar to the definition quoted above. However, unlike the telecommunications and computer equipment at issue in *Allegrino,* the Varian Linac is attached to the building in a manner that could reasonably be expected to "continu[e] or endur[e] without fundamental or marked change."

In disputing this point, Travelers makes much of the fact that the Varian Linac at issue was purchased used and installed at the East Bruceton Road facility after the predecessor Mitsubishi model malfunctioned. Moreover, approximately four or five years after the Linac was installed at Jefferson Radiation, the facility ceased treating patients and Castro inquired into the possibility of selling or scrapping the Linac, although no such action ultimately occurred. Travelers also notes that Gallo and Castro had interests in other treatment practices where the linacs were at one point or another removed or scrapped. According to Travelers, this evidence shows that the Linac in question was not "irremovable" or permanently attached to the building.

The court is not persuaded that these facts render plaintiffs' interpretation of the Policy unreasonable as a matter of law. To the extent that a "permanently attached" piece of equipment connotes its lack of "removability" from the surrounding structure, one can reasonably view the Varian Linac as satisfying that standard. Because, in actuality, no part of a building is completely "irremovable" or "permanent," one can reasonably interpret the "removability" of an item in terms of how practicable or facile its removal from the surrounding structure would be. Here, the undisputed facts show that the Varian Linac is capable of being removed from Jefferson's treatment facility only through fairly extraordinary measures that would involve special machinery, a crew of specialized workers (including a medical physicist), and damage to the physical plant. Thus, although it is certainly possible to physically remove the Linac from Jefferson's facility, it would be extremely impracticable to install or remove that equipment with any frequency. Thus, one could reasonably conclude that the Varian Linac was not installed on a "temporary" basis. Indeed, the record reflects that the predecessor Mitsubishi Linac remained in place for some seventeen years and was only removed when it became nonfunctional. The fact that linear accelerators are physically capable of being bought, sold, moved, installed, or removed from a building does not make the physical mode of their attachment in a structure any less permanent.

Travelers also argues that the term "permanently attached" must be construed consistently with the court's reasoning in *Northeastern Pennsylvania Imaging Center. v. Commonwealth,* 35 A.3d 752 (Pa. 2011). In that case, the Pennsylvania Supreme Court confronted "the issue of whether the sale of MRI and PET/CT Scan systems and related service agreements constitutes a sale of 'tangible personal property or services' on which sales tax is due." 35 A.3d at 757. This question turned on the court's interpretation of certain provisions of

the Pennsylvania Tax Reform Code. *See id.* (recognizing the issue as one of statutory

interpretation). As summarized by the court,

> "the Code's plain language imposes a sales tax on the purchaser when tangible
> personal property is sold, and imposes a use tax on the contractor when
> tangible personal property is used as or becomes part of real estate or a real
> estate structure." 35 A.3d at 758.[9] To effectuate the sales tax provision, the
> Pennsylvania Administrative Code, "61 Pa. Code §31.11[,] defines 'sales
> activities' as: 'An activity resulting from an agreement or contract under
> which a contractor transfers tangible personal property or performs services
> upon tangible personal property belonging to another person and *installs the
> property so as not to become a permanent part of the real estate.'"

*Id.* (quoting 61 Pa.Code §31.11) (emphasis in the original). By contrast, section 31.11

defines "construction activities" that are subject to the use tax to include: "'[a]n activity resulting

from an agreement or contract under which a contractor *attaches or affixes tangible personal

property to real estate so as to become a permanent part thereof.'"* 35 A.3d at 758 (quoting 61

Pa. CODE §31.11 (emphasis in the original)). The court therefore viewed the relevant question as

whether the machines in question were "installed or attached so as to become a permanent part of

the real estate." *Id.*

In resolving this issue, the court in *Northeastern Pennsylvania Imaging* relied on several

factors it had previously utilized when addressing the distinction between sales and use taxes in

*Commonwealth v. Beck Electric Construction, Inc.,* 403 A.2d 553 (Pa. 1979), namely: "the

character of the object, its ability to be installed and removed, its degree of portability, and

whether it maintained its functional integrity after installation." *Northeastern Pa. Imaging Ctr.,*

---

[9] Section 7202(a) of the Tax Reform Code (the "Code") imposes a six percent tax on the "'sale at retail' of 'tangible personal property or services,'" which must be paid by the purchaser at time of sale. *See Northeastern Pa. Imaging,* 35 A.3d at 758 (quoting 72 Pa. Stat. §7202(a)). By contrast, "Section 7202(b) of the Code imposes a six percent 'use' tax on tangible personal property purchased at retail, payable to the Commonwealth 'by the person who makes such use.'" *Id.* (quoting 72 Pa. Stat. §7202(b)). "'Use' includes '[t]he obtaining by a construction contractor of tangible personal property or services provided to tangible personal property which will be used pursuant to a construction contract...'" *Id.* (quoting 72 Pa. Stat. §7201(o)(17)) (alteration in the original). For purposes of the Code, a "construction contract" is defined as "'[a] written or oral contract or agreement for the construction, reconstruction, remodeling, renovation or repair of real estate or a real estate structure.'" *Id.* (quoting 72 Pa. Stat. §7201(nn))(alteration in the original).

35 A.3d at 761; *see also Beck,* 403 A.2d at 556-558.  In developing these factors, the court in *Beck* had been guided by the Commonwealth Department of Revenue's then-existing regulation 150, which included a list of items not subject to use tax.  *See Northeastern Pa. Imaging,* 35 A.3d at 760 (discussing *Beck,* 403 A.2d at 556-557).  In *Northeastern Pennsylvania Imaging,* the court noted that "Regulation 150's principles still exist," and are now "embodied in 61 Pa. Code §§31.11-.16."  35 A.3d 760 (citation omitted).  Notably, "Section 31.11... states that absent proof to the contrary, certain items will be presumed not to become a permanent part of the real estate; the same section also provides examples of what will be presumed, absent proof to the contrary, to become a permanent part of the real estate." *Northeastern Pa. Imaging,* 35 A.3d at 760-61 (citing 61 PA. CODE §31.11).

 The court in *Northeastern Pennsylvania Imaging* found the examples in the regulation "quite instructive," and noted that: "[s]pecifically regarding medical equipment, only nurses' aid stations are listed as an item presumed to be so affixed as to become part of the property and thus be subjected to use tax.  Such stations are empirically distinct from equipment, different in terms of structural features, their function and placement, and their usage." *Id.* at 761.  The court further noted that:

> Section 31.11's presumption that other items are not affixed to the real estate, and thus subject to sales tax, applies to many enumerated items found in a medical setting, including operating room lights, oxygen and gas systems, and, most tellingly, x-ray illuminators and equipment. *Id.* While these listings are not exhaustive, we can hardly ignore them.

*Id.*  The court found "no factual reason in [the] record to ignore these logical presumptions and empirical guideposts" and reasoned that "[c]learly an MRI machine is more like x-ray equipment than a nurses' station." *Id.*

The court in *Northeastern Pennsylvania Imaging* also explained that the MRI and PET/CT Scan systems at issue could not be considered items for "use pursuant to a construction

contract," because that term references "items of personalty that are really part of construction – things such as sinks, wiring, flooring, carpet and wallpaper, recessed lighting – things that are subject to sales tax for you and me at the hardware store, but subject to use tax if part of a construction contract." *Northeastern Pa. Imaging,* 35 A.3d at 761. As to the latter items, the court explained that "it is inefficient at best to charge sales tax at the end of a construction contract – there tax is more easily rolled into the price of materials 'used' in the construction contract." *Id.* Moreover, "[t]he construction contract did not 'use' these devices – it simply resulted in a place to put them." 35 A.3d 762.

Ultimately, the court found that the MRI and PET/CT Scan systems were "nothing more than cameras" and were "removable and replaceable." *Northeastern Pa. Imaging,* 35 A.3d 762. Although their large size made them cumbersome, the court found that their size did not make them part of the building; therefore, the equipment was not subject to sales tax under the Pennsylvania Tax Code. *Id.*

Travelers interprets *Northeastern* as counseling that, for purposes of determining whether the Policy was intended to cover the Linac as part of the "building," this court must look to additional factors besides the manner of its attachment, such as "the nature of the Varian Linear Accelerator, its degree of portability, and its functional integrity after installation." (Def.'s Br. Opp. Pl.s' Mot. Summ. J. at 2, ECF No. 125.) Based on the similarities between the Varian Linac and the MRI and PET/CT Scan systems at issue in *Northeastern Pennsylvania Imaging,*[10] Travelers maintains that this court should find, as a matter of law, that the Varian Linac was not permanently attached to the surrounding building.

---

[10] Travelers notes, with respect to the MRI and PET/CT Scan systems at issue in *Northeastern Pa. Imaging,* that the installation and removal of that equipment required substantial interior and exterior construction and took multiple days, the machines weighed up to 20,599 pounds and were anchored into the concrete below the floor, and the PET/CT systems were hardwired into the building's electrical system. (*See* Def.'s Br. Opp. Pl.s' Mot. Summ. J. at 3 (citing *Northeastern Pa. Imaging,* 35 A.3d at 754, 757).)

This court is not persuaded that the reasoning and holding of *Northeastern Pennsylvania Imaging* render plaintiffs' interpretation of the Policy untenable as a matter of law. As the foregoing discussion illustrates, the court's opinion in *Northeastern Pennsylvania Imaging Center.* did not concern the interpretation of an insurance policy, but rather the construction of a statute that has no applicability to the present dispute. Notably, the court's reasoning in *Northeastern Pennsylvania Imaging* was expressly guided by regulatory presumptions established by the Department of Revenue relative to whether various items are deemed to become part of real estate for purposes of the Commonwealth's use tax, an issue not implicated here. *See* 35 A.3d at 761 ("*Beck* looked to Regulation 150, now embodied in §31.11, to determine whether an object was subject to sales or use tax, and so should we."). In choosing to follow the line of analysis outlined in *Beck,* the court in *Northeastern Pennsylvania Imaging* expressly eschewed a line of analysis that would involve examining the relevant parties' intent. *See Northeastern Pa. Imaging,* 35 A.3d at 761 ("Beck's inquiries address salient matters better than examining 'manifestation of intent through conduct.'"); *see also id.* at 756 (discussing the Commonwealth Court's flawed analysis, which had focused, in part, on whether the systems in question were intended to be permanent). This case, however, deals with the interpretation of an insurance policy and the court is expressly charged with interpreting the language of the Policy with the goal of ascertaining the mutual intent of the parties and plaintiffs' reasonable expectations as it relates to the issue of insurance coverage. Although a court's interpretation of an insurance policy may be informed by an undefined term that possesses a clear legal meaning, *see City of Erie, Pa. v. Guar. Nat'l Ins. Co.,* 109 F.3d 156, 163-64 (3d Cir. 1997); *Whole Enchilada, Inc. v. Travelers Prop. & Cas. Co. of Am.,* 581 F. Supp. 2d 677, 699 (W.D. Pa. 2008),

the court's analysis in *Northeastern Pennsylvania Imaging* is too inapposite to supply a clear legal meaning to the contractual terms at issue in this case.

In any event, the court is not persuaded that the factors cited in *Northeastern Pennsylvania Imaging,* -- such as the nature of the Varian Linear Accelerator, its degree of portability, and its functional integrity after installation -- are factors that compel an adoption of Travelers' interpretation of the Policy. Travelers points to evidence that there is a market for the sale of linear accelerators, as demonstrated by the purchase and contemplated sale of the Linac in this case; however, this is likely true of almost any type of machinery or equipment, even commercial equipment that Travelers would view as indisputably within the scope of Section A.1.a.3. As previously discussed, Travelers places great reliance on the fact that linear accelerators can, and have been, removed from their surrounding buildings and scrapped, as was the case with the Mitsubishi model and certain linacs that existed in Gallo's and Castro's other treatment facilities. Again, however, the physical ability to remove the Varian Linac from the building structure does not unambiguously compel the conclusion that its mode of attachment is "nonpermanent" as that term is commonly understood, particularly in light of the extensive measures and the resulting damage to the building that removal entails.

Travelers also theorizes that the Linac must be considered nonpermanently attached because it services plaintiffs' business of treating cancer patients, as opposed to servicing the building itself. It is notable, however, that the Policy delineates five separate categories of items that constitute part of the building, only one of which specifically requires that the item service the building. (*See* Policy §A.1.a.4 ("Personal property owned by you that is used to maintain or service the building or structure or its premises...."), ECF No. 114-1, at 20.) The Policy's exclusion of this requirement from Section A.1.a.3 can reasonably be viewed as indicating that it

was not intended to be a requirement for equipment that is otherwise permanently attached to the building. Construing the Policy in the manner suggested by Travelers arguably renders Section A.1.a.3 superfluous in the context of this case, because Section A.1.a.4 already affords "building" coverage to the insured's "[p]ersonal property ... that is used to maintain or service the building or structure or its premises." (ECF No. 114-1 at 20, §A.1.a.4.) In any event, even if servicing the building is a relevant requirement under Section A.1.a.3, one can reasonably argue that this requirement has been met. The evidence in this case shows that the facility at 521 East Bruceton Road was specifically designed and constructed to treat cancer patients with the use of a linear accelerator that would be housed in the "vault." The original linac was installed when the facility was built, and it remained in place when Rosewood purchased its interest in Jefferson's business. Under the unique facts of this case, the Linac arguably does service the building, at least with respect to the building's highest end use.

Based upon the foregoing considerations, the court cannot say that the Policy unambiguously covers the Linac as "machinery and equipment" that is business personal property. As discussed, the Policy can be read such that building coverage is afforded to the Linac as machinery or equipment that is "permanently attached to the building or structure."

Even so, Travelers insists, in the alternative, that the Policy unambiguously covers the Varian Linac as a business personal property "fixture" within the meaning of A.1.b.1. Under Section A.1 of the Policy's "Building and Personal Property Coverage Form," "fixtures" are covered in two separate categories: the "building" coverage is afforded to "[f]ixtures, including outdoor fixtures" under Section A.1.a.2, while business personal property coverage applies to "[f]urniture and fixtures" under Section A.1.b.1. (ECF No. 114-1 at 20.) Travelers contends that meaning must be given to both references to the undefined term "fixtures," and it posits that

Section A.1.a.2 refers to "fixtures" that become part of the realty, while A.1.b.1 refers to "fixtures" that are personal property. Pennsylvania law recognizes a general presumption that fixtures become part of the realty, but it also recognizes a general exception to this rule for "trade fixtures." *See, e.g., Kaczmarek v. Mesta Mach. Co.,* 324 F. Supp. 298, 300 (W.D. Pa. 1971) (noting the general rule that "when equipment is so physically annexed to the land that it cannot be removed without material injury to the land or some structure thereon, it is deemed incorporated into the realty," but recognizing that "trade fixtures brought upon the premises by the occupant, essential to his use of the property, but removable without damage to the structure are not real estate"); *Cattie v. Joseph P. Cattie & Bros., Inc.,* 168 A.2d 313, 314 (Pa. 1961) (fixtures and equipment which tenant attaches to realty for the operation of his business are "trade fixtures" and tenant is presumably entitled to remove them during or at termination of the lease). Travelers contends that, to the extent the Varian Linac is a fixture, it is trade fixture and, thus, is unambiguously covered under Policy Section A.1.b.1.

Travelers' argument that the Linac is a trade fixture covered under Section A.1.b.1 has some force. It is undisputed that plaintiffs did not own the building at 521 East Bruceton Road,[11] but they did purchase and install the Varian Linac. (ECF No. 147, ¶¶ 42, 58.) In addition, plaintiffs installed the Linac for use in connection with their treatment of patients at the facility; thus, it was used in their trade. At one point when Jefferson's patient base began to decline,

---

[11] Although Jefferson's status as a commercial tenant appears to be undisputed, the court notes that Travelers' "trade fixture" argument is based partly on the contents of a "lease," which it claims was operative as between plaintiffs and Mercury III, the building's current owner. (ECF No. 121-11.) In actuality, the "lease" evidence shows that, in 2004, OSC (the original property owner) purported to assign to Mercury III (the current property owner) its rights under an unexecuted lease agreement between OSC and Jefferson that is dated April 1, 1992. There is no evidence to suggest that plaintiffs ever possessed a copy of the lease and plaintiffs deny any knowledge about whether its terms were operable during times relevant to this litigation. Travelers notes that Doug Colkitt, President of OSC, executed the purported assignment and testified that the attached lease was the governing lease between Mercury and Jefferson; however, Colkitt's statements in this respect are merely legal conclusions unsupported by the existence of a validly executed agreement. Under these circumstances, the lease is of no evidentiary value in terms of understanding the reasonable expectations of the insured, and the court will not consider it in its analysis of the Policy.

Castro considered selling the Linac. These facts tend to support the view that the Linac was plaintiffs' personal property and not part of the building.

Ultimately, however, Travelers' proffered interpretation merely highlights the ambiguities in the Policy rather than resolving them. The term "fixtures" is undefined in the Policy, and Traveler's interpretation of Section A.1.b.1 assumes that the concept of "trade fixtures" is meant to be incorporated into that undefined term. In addition, Travelers' interpretation reads into Section A.1.a.3 an exclusion for trade fixtures that is not present in the language of the Policy. Although it is not necessarily unreasonable to read the Policy in this manner, it is also not unambiguously clear that this was the parties' intent. *See Heebner v. Nationwide Ins. Enterprise,* 818 F. Supp. 2d 853, 857 (E.D. Pa. 2011) (finding policy ambiguous with respect to coverage for delay damages and noting that "if Nationwide desired not to provide coverage for delay damages it could have easily done so"); *Erie Ins. Exch. v. E.L. ex Rel. Lowry,* 941 A.2d 1270, 1277 (Pa. Super. Ct. 2008) (concluding that, in drafting an exclusion in the insured's policy, insurer could have utilized more precise language if it intended to preclude coverage). In fact, reading the Policy in this manner arguably renders A.1.a.3 superfluous, because the Policy's provision for building "fixtures" under Section A.1.a.2 would seemingly apply to any permanently attached building equipment or machinery that is not a trade fixture. Even if the Policy is construed to mean that trade fixtures are generally covered as business personal property fixtures rather than as part of the building, one could still reasonably construe Section A.1.a.3 as covering those types of trade fixtures, like the Varian Linac, whose removal would cause substantial damage to the property, since the latter are not necessarily recognized as property of the commercial tenant. *See In re Watson*, No. 4-13-AP-00203-JJT, 2016 WL 4434339, at *3 (Bankr. M.D. Pa. Aug. 19, 2016) (noting that a tenant has the right to remove

31

property that is a trade fixture "so long as it can be accomplished without material damage to the premises," and explaining that "'[t]his limitation is based upon the presumption that the parties would not have intended for the fixture to be removed if removal would materially damage the remaining estate.'") (quoting 2 Tiffany Real Prop. § 617 (3d ed.)); *Kaczmarek*, 324 F. Supp. at 300 ("[T]rade fixtures brought upon the premises by the occupant, essential to his use of the property, but removable without damage to the structure are not real estate.") (citation and internal quotation marks omitted).

In sum, based upon the facts of this case, the Linac could be considered a trade fixture which is personal property of plaintiffs; however, it could also be viewed as equipment permanently attached to the building structure consistent with the building's original dedicated purpose. The Policy is therefore ambiguous as it applies to this case. In addition, the term "permanently attached" is itself ambiguous. Plaintiffs' proffered interpretation of the phrase focuses on the Linac's physical mode of attachment and the impracticability of ready extraction, whereas defendant's proffered interpretation of the phrase focuses on attributes of plaintiffs' ownership of the equipment and its utility relative to the surrounding structure. Based upon the plain language of the Policy as a whole, the court is unable to conclude that either interpretation is patently unreasonable. Accordingly, the court must resort to well-established rules of construction to ascertain the meaning and intent of the Policy.

Under Pennsylvania law, "'[a]mbiguous provisions in an insurance policy must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control.'" *Med. Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999)(quoting *McMillan v. State Mut. Life Assurance Co.*, 922 F.2d 1073, 1075 (3d Cir.1990)). Pennsylvania courts have liberally applied this rule. *Id. See Am. Auto. Ins. Co. v.*

*Murray*, 658 F.3d 311, 321 (3d Cir. 2011). The court will construe the Policy in favor of

plaintiffs, the insured, and conclude that the Varian Linac is subject to coverage as part of the

building under Policy Section A.1.a.3. Based upon this conclusion, plaintiffs' motion for partial

summary judgment will be granted and defendant's cross-motion for summary judgment with

respect to this issue will be denied.[12]

### B. Plaintiffs' Bad Faith Claim

In Count Three of the complaint, plaintiffs assert a claim under Pennsylvania's bad faith

statute, 42 Pa. Cons. Stat. §8371. Their theory is that Travelers lacked a reasonable basis for

treating the Linac as business personal property and that it committed various acts of bad faith in

the handling of their claim. Travelers contends there are no genuine issues of material fact to

support a claim of bad faith.

Under Pennsylvania law, "bad faith" is defined as:

> "'any frivolous or unfounded refusal to pay proceeds of a policy; it is not
> necessary that such refusal be fraudulent. For purposes of an action against an
> insurer for failure to pay a claim, such conduct imports a dishonest purpose and
> means a breach of a known duty (i.e., good faith and fair dealing), through some
> motive of self-interest or ill will; mere negligence or bad judgment is not bad
> faith.'"

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 498 (3d Cir. 2015) (quoting *Terletsky v.*

*Prudential Property & Cas. Ins.. Co.*, 649 A.2d 680, 688 (Pa. Super Ct. 1994) (quoting Black's

Law Dictionary 139 (6th ed.1990)).

"To recover under section 8371, a plaintiff must show by clear and convincing evidence

that the insurer did not have a reasonable basis for denying benefits under the policy and that the

---

[12] Count Two of the complaint sets forth plaintiffs' claim for breach of contract. Based on the current record, it
appears that genuinely disputed issues of fact exist relative to Travelers' alleged failure to pay amounts due under
the Policy, even separate and apart from the issue of the Linac. Accordingly, summary judgment will be denied as
to that claim.

insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Wolfe*, 790 F.3d at 498 (3d Cir. 2015) (citing *Terletsky*, 649 A.2d at 688); *see Adeniyi-Jones v. State Farm Mut. Auto. Ins. Co.*, No. CV 14-7101, 2016 WL 3551486, at *3 (E.D. Pa. June 30, 2016). Mere negligence is not sufficient to establish a bad faith claim. *Boulware v. Liberty Ins. Corp.*, No. 3:13-CV-1541, 2015 WL 1219283, at *7 (M.D. Pa. Mar. 17, 2015).

"The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Bostick v. ITT Hartford Group, Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)). The plaintiff's burden is equally high at the summary judgment stage of litigation, and the plaintiff must point to evidence that meets this heavy evidentiary requirement. *J.C. Penney*, 393 F.3d at 367 (citing *Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 588 (E.D. Pa. 1999)). Further, "[i]n a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Bostick v. ITT Hartford Group, Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citation omitted).

To the extent plaintiffs' bad faith claim is premised on Travelers' refusal to cover the Linac as part of the "building," they cannot demonstrate a triable issue of bad faith conduct. As set forth in detail above, the court has determined that the Policy's language in Section A.1.a.3 is ambiguous. Moreover, the court has determined that Travelers' interpretation of the phrase "permanently attached" is reasonable, albeit not one that can prevail under the laws governing the interpretation of an insurance policy. Given this fact, plaintiffs have not shown that Travelers acted in bad faith when it decided to cover the Linac as personal property of the

insured, rather than as part of the building. *See Gray v. Allstate Indem. Co.*, No. 3:13-CV-1232, 2015 WL 758292, at \*11 (M.D. Pa. Feb. 23, 2015) (no bad faith existed where the insurer's interpretation of ambiguous policy terms was reasonable); *Mitch's Auto Serv. Ctr., Inc. v. State Automobile Mut. Ins.Co.,* Civil Action no. 10-3413, 2011 WL 5042480, at \*7 (E.D. Pa. Oct. 24, 2011) ("[A]mbiguity is not bad faith. Indeed, an ambiguous contract term is one that is subject to more than one *reasonable* interpretation."); *Bostick,* 56 F. Supp. 2d at 587 ("Bad faith cannot be found where the insurer's conduct is in accordance with a reasonable but incorrect interpretation of the insurance policy."); *Globe Indem. Co. v. Mohenis Servs., Inc.*, No. CIV. A. 97-3849, 1998 WL 409026, at \*7 (E.D. Pa. June 29, 1998) ("[C]overage for Ellis's claims could potentially only be found under ambiguous policy provisions. Globe cannot be seen as acting in bad faith in denying coverage based on one reasonable interpretation of that ambiguous provision."); *Egger v. Gulf Ins. Co.*, No. 1908 MAY TERM 2001, 2004 WL 516687, at \*3 (Pa. Com. Pl. Mar. 10, 2004) ("[I]t is important to note that where an insurance policy is susceptible to more than one reasonable interpretation, as here, the fact that the policy is found to be ambiguous and therefore construed against the insurer is insufficient, in and of itself, to establish bad faith.") (citing *Lawson v. Fortis Ins. Co.*, 301 F.2d 159, 167 (3d Cir.2002)).

Plaintiffs argue that their bad faith claim cannot be defeated by the fact that Travelers may have articulated a reasonable basis for denying coverage "after the fact." (See Pls.' Br. Opp. at 27-28.) However, this argument overlooks the fact that the first element of a bad faith showing – i.e., whether the insurer lacked a reasonable basis for denying coverage – is an objective one. *See Meyer v. Cuna Mut. Grp.*, No. CIV.A. 03-602, 2007 WL 2907276, at \*12 (W.D. Pa. Sept. 28, 2007), *aff'd sub nom. Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154 (3d Cir. 2011) ("Courts apply an objective analysis to the first prong of the liability test..."). Thus, "[i]f

there is a reasonable basis for denying resolution of a claim, even if it is clear that the insurer did not rely on that reason, there cannot, as a matter of law, be bad faith." *Oehlmann v. Metro. Life Ins. Co.*, 644 F. Supp. 2d 521, 528 (M.D. Pa. 2007) (citing *Williams v. Hartford Cas. Ins. Co.*, 83 F.Supp.2d 567, 574 (E.D.Pa.2000)); *see Meyer*, 2007 WL 2907276, at *12 ("[A]ny reasonable basis for the insurer's conduct is sufficient to demonstrate that the insurer did not act in bad faith under Section 8371.") (citation omitted).

Nevertheless, "Pennsylvania law does not limit bad faith claims to unreasonable denials of coverage[ ]," and "[a] bad faith [claim] can have various other bases, including an insurer's lack of investigation, lack of adequate legal research concerning coverage, or failure to communicate with the insured." *Davis v. Allstate Property and Cas. Co.*, 2014 WL 4857434, at *9 (E.D. Pa. September 30, 2014) (citing *Coyne v. Allstate Ins. Co.*, 771 F. Supp. 673, 678 (E.D.Pa.1991); *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 524 (W.D.Pa.2012)); *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir.1999) (a bad faith claim includes "a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured."). Thus, "the statute is to be given broad interpretation." *Kohn v. Unum Provident Corp.*, Civil Action No. 2:04-cv-4929, 2008 WL 4787556, at *8 (E.D. Pa. Oct. 31, 2008).

To the extent plaintiffs' bad faith claim is premised on Travelers' failure to communicate its reason for refusing to cover the Linac as part of the "building," the court is satisfied that plaintiffs demonstrated the existence of a triable issue of fact. The evidence shows that, following O'Neal's disclosure to Colkitt that the Linac would be treated as business personal property, Colkitt made repeated requests that Travelers place its reasoning in writing; however, no written explanation or statement was provided. Travelers' first written statement concerning

its position on coverage for the Linac occurred in the context of filing its answer to plaintiffs' complaint in this action. Plaintiffs insist that Travelers' failure to respond is what compelled them to initiate this litigation. Relevantly, plaintiffs' expert, Michael Sapourn, opined that "Travelers' failure to respond to seven written requests from Marcy Colkitt for their coverage position regarding the linear accelerator constitute[d] ... a breach of industry standards." (ECF No.131-1, p. 10, 12.) *See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* No. CIV. A. 02-2116, 2006 WL 1437169, at *4 (W.D. Pa. Jan. 19, 2006) (an expert witness may testify under Fed. R. Evid. 702 about industry-wide insurance practices). The court finds that plaintiffs adduced evidence sufficient to support a finding that Travelers acted in bad faith by failing to communicate with them about its reasons for covering the Linac as personal property.[13]

Travelers insists that plaintiffs' insurance claim was given prompt and serious attention and that its failure to provide a written coverage decision was the result of plaintiffs short-circuiting the claims resolution process by prematurely filing suit. Travelers argues that plaintiffs were on notice that an investigation of their claim was still ongoing at the time this lawsuit was commenced. Insofar as the resolution of plaintiffs' claim was delayed, Travelers faults Colkitt for: (a) failing to apprise the company of plaintiffs' lease terms relative to the Linac, (b) failing to inform Travelers that the Linac had been purchased and brought in from another location, (c) representing to Travelers' agents that, if the building were sold, the Linac

---

[13] Although not dispositive of the issue, the court notes that Travelers' actions are arguably within the scope of unlawful practices set forth in Pennsylvania's Unfair Insurance Practices Act and Unfair Claim Settlement Practices regulations. *See* 40 Pa. Stat. §1171.5(a)(10)(vii)(unfair practices include "[c]ompelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons"); *id.* at §1171.5(a)(10)(xiv) (unfair practices includes "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."); 31 PA. CODE §146.7 ("An insurer may not deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to the provision, condition or exclusion is included in the denial."). "Although ... violations of the Unfair Insurance Practices Act and the Unfair Claim Settlement Practices Regulations are not *per se* violations of the bad faith standard, they are admissible and relevant to support claims of bad faith." *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 436 (3d Cir. 2007) (citing *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1233 (Pa. Super. Ct. 1994)).

would be sold with it, and (d) failing to advise Travelers that Castro had previously investigated selling the Linac. Travelers also takes issue with the opinion of Mr. Sapourn on the ground that he failed to consider plaintiffs' refusal to assist in the investigation of their claim.

While Travelers' arguments present ample fodder for the fact finder's consideration at time of trial, the court is not persuaded that they support a grant of summary judgment. Although it is true that Travelers' investigation was still ongoing at the time this lawsuit was commenced, Travelers had already determined at that point that the Linac would be covered as business personal property, and there is no indication in the record that its continuing investigation related to a possible reversal of that decision. Insofar as Colkitt's conduct is concerned, this court has previously determined that the "lease" in question is unsigned and has no apparent operable effect. In the absence of any evidence suggesting that plaintiffs possessed a copy of the lease or were aware of its terms, Colkitt cannot be faulted for failing to produce that information. There is no indication that Colkitt advised Travelers of anything that was demonstrably untrue concerning the Linac and, in any event, for purposes of determining bad faith, it is the conduct of the insurer, not the insured, that matters. *Mohney v. Am. General Life Ins. Co.*, 116 A.3d 1123, 1138 (Pa. Super. Ct. 2015) ("As a general matter, we agree ... that the analysis of an insurance bad faith claim 'is dependent on the conduct of the insurer, not its insured.'"). Finally, Travelers' criticisms of Mr. Sapourn's opinion go to the weight, not the admissibility of his testimony, and are matters for the factfinder to consider at time of trial.

Ultimately, the record in this case allows for competing inferences in terms of whether or not Travelers lacked a reasonable basis for its conduct and recklessly disregarded its obligations to its insured, thereby compelling plaintiffs to file this action. Notwithstanding plaintiffs' burden to prove their bad faith claim by clear and convincing evidence, the court is satisfied that, when

viewing the totality of evidence in this case in the light most favorable to plaintiffs, genuine issues of material fact exist and support plaintiffs' claim.

The remainder of plaintiffs' bad faith allegations cannot survive summary judgment. To the extent plaintiffs contend that Travelers' research or investigation into the coverage issue was inadequate, the court is not persuaded that clear and convincing evidence of bad faith was shown to exist. The record here establishes that, at the time of Travelers' coverage determination, Colkitt had fully informed Travelers' claims representatives about the factual basis for plaintiffs' argument in favor of building coverage. In addition, Strittmatter had examined the equipment and confirmed the manner in which the Linac is connected to the building. Prior to making a final coverage determination, Travelers' claims manager, Brian Murphy, consulted with the company's Property Technical Claims Unit and was referred to various web links and articles about linear accelerators. Murphy also consulted with an engineer who opined that the Linac should not be considered part of the building. Plaintiffs note that the engineer had limited experience with linear accelerators and acknowledged that he was not personally qualified to inspect the machine. However, to defeat a claim of bad faith, an insurance company need not demonstrate that "the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusion." *Boulware*, 2015 WL 1219283, at *7. Instead, it need only show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action. *Id*. Plaintiffs suggest that Travelers should have performed legal research or conducted further investigation into how the accelerator is attached, but they do not articulate how doing so would have led to a change in Travelers' interpretation of the Policy language. Given the nature of the dispute in this case and the court's determination that the policy language at issue was ambiguous, there is no

39

basis from which a fact finder could conclude, by clear and convincing evidence, that Travelers' failed to conduct a good faith investigation into plaintiffs' claim.

Plaintiffs maintain that Travelers committed bad faith by adding a self-serving condition to the Policy which it knew did not exist. This theory is based on Travelers' construction of Section A.1.a.3 as incorporating the requirement that attached equipment must "service the building" in order to be considered "permanently attached." Plaintiffs cite to *Mohney v. American General Life Insurance Co.*, 116 A.3d 1123, 1133 (Pa. Super. Ct. 2015), for the proposition that an insurer acts in bad faith when it adds requirements to a policy in order to deny benefits. In *Mohney*, the court faulted the insurer for interpreting the term "total disability" in a manner which precluded credit disability coverage for its insured based upon a doctor's statement that the insured could "attempt" to work. 116 A.3d at 1133. The court found that the insurer had no reasonable basis for its denial of coverage, *id.* at 1134, as there was "nothing in the definitions of the term 'Total Disability' in the two insurance policies [that provided], or even suggests, that a person is not totally disabled if a doctor signals that the policyholder may 'attempt to work.'" *Id.* at 1133. Here, however, the court found that the relevant policy language is ambiguous and susceptible to differing constructions. As previously discussed, the court is not persuaded by Travelers' suggestion that a requirement of "servicing the building" is unambiguously implied in Section A.1.a.3. Nevertheless, while Travelers' interpretation of Section A.1.a.3 is not the prevailing interpretation, the court cannot say that it is so unambiguously wrong as to support a finding of bad faith.

Plaintiffs also argue that Travelers demonstrated bad faith by taking advantage of the fact that they were financially distressed. In support of this claim, they cite a portion of Travelers' internal communications log from February 25, 2014, which documents a series of electronic

messages between Strittmatter and Murphy.  The log indicates that Strittmatter, upon learning that plaintiffs intended to file a lawsuit over the Linac coverage determination, stated: "I like how they have money to sue us LOL." (ECF No. 131-4.)   Viewed in context, Strittmatter's comment appears to be nothing more than a stray remark which postdated, and is unrelated to, the claims handling decision that is central to this lawsuit.  Though perhaps ill-advised, the comment fails to prove that Travelers knowingly took advantage of its insured's financially distressed condition.

Plaintiffs next assert that Travelers acted in bad faith by misrepresenting its intentions to its insured.  Specifically, plaintiffs argue that Strittmatter misled plaintiffs by making them believe that she would be returning to the facility to finalize their claim, when in fact she had no intention of doing so.  Plaintiffs' sole piece of evidence in this regard is an electronic message that Strittmatter sent to David Reed on March 6, 2014 in which she stated:  "I understand, Marcy [Colkitt] called and left me a message that she would be available sat morning at 9am[.]  I am NOT doing that one either."  (ECF No. 131-5.)   However, the comment occurs in the context of an exchange wherein Strittmatter noted that further inventorying of plaintiffs' business personal property would be required in connection with Travelers' investigation of plaintiffs' claim; to that end, Strittmatter inquired whether Reed might be available to accompany her on a site visit. (*Id.*)  Reed replied, "As of right now I have Tue and Fri open where I might be able to spend an hr or two on site.  I have a bunch of conf calls and office meetings scattered on the other days.  If a large loss comes in it will have to go on one of those days."  (*Id.*)  Strittmatter replied with the objected-to comment that she would "NOT" be visiting Jefferson's facility at the time suggested by Colkitt.

The court is not persuaded that Strittmatter's comment is materially probative of bad faith. When viewed in context, the comment is at best ambiguous and suggests merely that Strittmatter viewed an early weekend appointment as unduly inconvenient. Plaintiffs failed to support sufficiently their assertion that Strittmatter had no intent to finalize their claim or that she deliberately misled plaintiffs in this regard.

Finally, plaintiffs assert that Travelers acted in bad faith by misrepresenting facts to its outside expert for purposes of manipulating the expert's conclusions about whether the Linac had sustained water damage. Plaintiffs' theory is premised on two items of evidence. First, they point to O'Neal's February 3, 2014 report of estimated damages wherein O'Neal indicated that plaintiffs would require $6,212.69 in repairs to the "treatment room," also known as the vault room (which housed the Linac). (ECF No. 131-7 at 3.) Second, they point to the January 30, 2015 report of Travelers' expert, Larry Henderson, whom Travelers retained "to determine the failures in the Varian [Linac] and to determine if the failures were related to direct water exposure." (ECF No. 131-6 at 1.) In his initial report, dated January 30, 2015, Henderson indicated, in relevant part, that he understood "no repair work was required or performed in the vault where the linear accelerator is housed." (*Id*.) From this evidence, plaintiffs infer that Travelers lied to Henderson in order to obtain a favorable report, but they provide no further elaboration about how Henderson came to form his "misunderstanding," or how those circumstances evidence bad faith on the part of Travelers. Plaintiffs also ignore the fact that Henderson subsequently issued a second report on July 17, 2015, in which he states his "understand[ing] that no repair work was required or performed, *based on [his] observations*, in the vault where the linear accelerator is housed." (ECF No. 135-1, at 2 (emphasis added.) When viewed in the context of the record as a whole, plaintiffs' evidence amounts to nothing more than

an insinuation of wrongdoing; yet "[a]n insured must prove the insurer's bad faith by clear and convincing evidence, and a mere insinuation of bad faith will not suffice." *Fugah v. State Farm Fire & Cas. Co.*, No. CV 14-6908, 2016 WL 1383702, at *4 (E.D. Pa. Apr. 7, 2016) (citing *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011)). This heightened standard of proof obliges the insured to provide evidence so clear, direct, weighty, and convincing such that, without hesitation, it can be determined whether the insurer acted in bad faith. *Id.* Based on a consideration of the record as a whole, the court concludes that no reasonable fact finder could find plaintiffs' proffer meets the "clear and convincing" evidentiary standard that is required by Section 8371.

In light of the foregoing, plaintiffs can proceed on their bad faith claim to the extent it is premised on defendant's failure to provide a written explanation of its coverage decision relative to the Linac. In all other respects, Travelers' motion for summary judgment will be granted as it relates to Count Three of the complaint.

### C. *Plaintiff's Motion to Strike the Affidavit of Chaz Beadling*

Finally, the court notes that plaintiffs filed a motion to strike the affidavit of Chaz Beadling, which is set forth as "Exhibit 13" to defendant's Appendix to Concise Statement of Undisputed Material Facts (ECF No. 127). Plaintiffs object to the affidavit on the basis that Mr. Beadling was not disclosed as a witness until after discovery had closed. They also contend that Mr. Beadling's affidavit proffers a mixture of expert and lay testimony which fails to conform to the requirements of Federal Rule of Civil Procedure 56 and Federal Rule of Evidence 702.

Federal Rule of Civil Procedure 12(f) permits the court, in its discretion, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Because Mr. Beadling's affidavit is not a "pleading," it is not

subject to Rule 12(f).  *See Polite v. Dougherty Cnty. Sch. Sys.,* 314 F. App'x 180, 184 n.7 (11th Cir. 2008) (finding no error in the district court's denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading"); *Bradfield v. Easterling,* No. 12-1248, 2016 WL 1242593, at *1 n.1 (W.D. Tenn. Mar. 29, 2016) ("While Federal Rule of Civil Procedure 12(f) authorizes a motion to strike a "pleading" for various reasons, motions and affidavits are not pleadings.") (citing Fed. R. Civ. P. 7(a)); *Burchfield v. CSX Transp., Inc.*, Civil Action File No. 1:07-CV-1263, 2009 WL 1405144, at *8 (N.D. Ga. May 15, 2009) ("An affidavit is not a pleading. Therefore, a motion to strike is not appropriate.").  In any event, however, the court finds that Mr. Beadling's affidavit is immaterial to its resolution of the pending motions.  To the extent Mr. Beadling's affidavit contains information that is relevant to the issues in this case, it is redundant of information set forth elsewhere in the summary judgment record.  Accordingly, there being no basis to strike Mr. Beadling's affidavit, that motion will be denied.

### V.　　Conclusion

Based upon the foregoing reasons, plaintiffs' motion for partial summary judgment will be granted.  Defendant's cross-motion for summary judgment will be denied with respect to Counts One and Two of the complaint.  Defendant's motion will be denied with respect to Count Three insofar as plaintiffs' bad faith claim is premised on Travelers' failure to provide a written explanation of its coverage decision relative to the Linac; in all other respects, defendant's motion for summary judgment will be granted as it relates to Count Three of the complaint. Finally, plaintiffs' motion to strike the affidavit of Chaz Beadling will be denied.

An appropriate order follows.

By the court:


*/s/ Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge


Dated:  September 28, 2016